...er publications in the
...al literature, medical
...vernmental services.
...ciation. In pursuance
... project by the pub-
... medical preparedness
...n of the Division of
...cil was chosen to act

...he extent that it has
...mittee. Each of the
...an expert in one of
... of Medical Sciences
... this issue appears a
...of this Work, as well
...ters of the American
...k of information con-
...e Navy, for industry.
... The editorial
... issues not only
...ces, similar to the
...but to make adequate
...ession to the nation's

# INDUSTRIAL HYGIENE AND THE NAVY IN NATIONAL DEFENSE

ERNEST W. BROWN, M.D.
Captain, Medical Corps, United States Navy
NEW YORK

One of the most important concerns of the Medical Department of the United States Navy today is industrial hygiene, especially in navy yard practice. This is a situation of ever increasing moment in view of the present era of enormous expansion in naval construction, unparalleled in the history of the United States. This is bringing about a vast increase in the industrial force of the navy yards, and in all probability new problems in industrial hygiene will emerge incident to new materials and processes.

It should be remembered in this connection that the policy of the Navy Department is to allot new naval construction on an equal basis to government and commercial yards. It follows that the commercial establishments are also undergoing rapid development, with an enormous rise in industrial personnel. They will therefore be confronted with problems of industrial hygiene similar to many of those arising in navy yards.

Industrial hygiene is a field which is now undergoing rapid development. This appears to be due to certain significant trends, the most important of which has been the recent setting up of many industrial hygiene units in state or city departments of health through funds released by the passage of the Social Security Act. These trends, in fact, particularly that just mentioned, reflect a definite renaissance of industrial hygiene as a phase of public health in the United States.

This movement is receiving increasing recognition in naval industrial circles, and industrial hygiene is now listed as a specialty of the naval medical officer along with other specialties outside the purely clinical fields, such as aviation medicine, submarine medicine and chemical warfare medicine.

Those just mentioned, however, are concerned primarily with naval personnel. Industrial hygiene, on the other hand, is largely occupied with federal industrial personnel. It therefore follows that the status of the senior medical officer of a major navy yard in relation to the industrial

Presented at the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., Pittsburgh, Nov. 13, 1940.



War Medicine, v. 1: 3-14, 1941

department is analogous in many respects to that of the medical director of a large commercial industrial plant. The object of this paper is to present an outline of the administration of industrial hygiene in navy yards, which are the chief industrial units of the Navy.

Mention should be made in this connection of the Subcommittee on Industrial Medicine of the Health and Medical Committee of the National Defense Council. The Surgeon General of the Navy is a member of the latter committee and is represented by two liaison naval medical officers in conjunction with the Subcommittee on Industrial Medicine. Important recommendations pertinent to the Navy and industrial health will result, and many of them undoubtedly will be put into effect.

The term industrial hygiene as applied in the present discussion is used in the specific sense of the prevention and control of occupational disease. The fact may be of interest that the first compensation law for occupational diseases in this country was one passed in 1908 by Congress for United States civil service employees. Compensation laws for industrial diseases have lagged far behind legislation covering accidents. Only sixteen states of the Union provided compensation for one or more occupational diseases up to the year 1937, although all but two provided legislation for accidental injuries.

## INDUSTRIAL ORGANIZATION OF NAVY YARDS

The mission of a navy yard is primarily the construction, maintenance and repair of naval vessels. The central administration of navy yards and, in fact, of all industrial shore stations of the Navy is vested in the Assistant Secretary of the Navy, in whose office is the Shore Establishments Division of the Navy Department.

There are eleven navy yards, located as follows: Portsmouth, N. H.; Boston; New York; Philadelphia; Washington, D. C.; Norfolk, Va.; Charleston, S. C.; Mare Island, Calif.; Puget Sound, Wash.; Territory of Pearl Harbor, Territory of Hawaii; and Cavite, Philippine Islands.

In addition, mention should be made of the following specialized industrial plants: the plants for the building of submarines at Portsmouth, N. H., and Mare Island, Calif.; the Naval Gun Factory at the Navy Yard, Washington, D. C., for the production of high caliber naval guns, torpedo tubes and accessories; the torpedo factories at Newport, R. I., and Alexandria, Va., for the manufacture of torpedoes; the powder plant at Indian Head, Md., for the production of Navy smokeless powder; the aircraft factory at Philadelphia for experimental air craft construction and repair; the naval armor plate plant at Charleston, W. Va., and the Naval Clothing Factory at Brooklyn.

the medical director
of this paper is to
ial hygiene in navy

ie Subcommittee on
Committee of the
of the Navy is a
y two liaison naval
ittee on Industrial
to the Navy and
oubtedly will be put

resent discussion is
trol of occupational
compensation law
passed in 1908 by
Compensation laws
ation covering acci-
isation for one
ugh all but two

YARDS

ruction, maintenance
ation of navy yards
Navy is vested in the
the Shore Establish-

Portsmouth, N. H.;
C.; Norfolk, Va.;
id, Wash.; Territory
Philippine Islands.
following specialized
ubmarines at Ports-
Gun Factory at the
of high caliber naval
actories at Newport,
orpedoes; the powder
of Navy smokeless
xperimental air craft
plant at Charleston,
yn.



*Organization of the New York Navy Yard.*—The New York Navy Yard may be taken as typical of a major yard. Its organization falls under two departments, i. e., the industrial department, headed by a naval captain of the engineering branch, and an operations or military department, under the direction of a naval line captain. As a conservative estimate it may be stated that 90 per cent of the activities of a navy yard are industrial.

Under the industrial manager there are at present twenty-three shops of different types, with a force per shop varying from 30 to 3,200 men. The total number of civil employees of this yard is now approximately 17,000. This is rapidly rising and, it is estimated, will exceed 20,000 in 1941.

### EXTENT OF THE CIVILIAN INDUSTRIAL FORCE OF THE NAVY

The combined industrial force of all navy yards is now approximately 130,000. In view of the pending program of naval construction it is estimated that this number will reach 150,000 in 1941. If made inclusive of all shore stations it will probably be close to 180,000.

In addition to the industrial force of navy yards, one must consider the employee volume in the commercial naval ship-building plants, such as the Newport News and Dry Dock Company, the New York Shipbuilding Corporation at Camden, N. J., and the Bethlehem concern at Quincy, Mass., which now employ from 12,000 to 15,000 men each. It is a conservative estimate that the combined industrial personnel of all such plants on both the east and the west coast will reach a peak of over 100,000.

### ORGANIZATION OF THE MEDICAL DEPARTMENT OF A NAVY YARD

The medical staff of the New York Yard consists of ten medical officers, five dental officers, one nurse, forty-five enlisted men and two civilian clerks. The chief activities with reference to industrial personnel may be summarized as follows:

(*a*) Preemployment physical examinations. All applicants for federal jobs are examined physically, although the standards for acceptance vary to some extent for different occupations.

(*b*) Periodic physical examinations. These, of course, are conducted with the object of medical supervision of certain groups of employees exposed to definite potential health hazards, such as foundrymen and spray painters.

(*c*) Physical examination of federal employees for retirement. This is for evaluation of the degree of disability and opinion as to disposition when total disability is alleged.

(*d*) Diagnosis, treatment and disposition of industrial injuries and occupational diseases.

(*e*) Administration of compensation cases. (*f*) Industrial hygiene and plant sanitation.

THE INDUSTRIAL MEDICAL OFFICER

An officer of the medical staff of the navy yard is specifically detailed for industrial hygiene administration subject to the direction of the senior medical officer. Figure 1 outlines the scope of his activities.

(*a*) Advice to the safety engineer. The adequate practice of industrial hygiene in navy yards, as in civil industry, is dependent on the close and efficient correlation of the work of the safety engineer and that of the industrial medical officer. It is essential to obtain a grasp of the functions of both officers in order properly to visualize industrial hygiene administration.



Fig. 1.—Organization for administration of industrial hygiene in navy yards.

(*b*) Inspection. The industrial medical officer is responsible for the general supervision of plant sanitation, i. e., ventilation, illumination, water supply, general cleanliness and adequacy and condition of sanitary facilities. He also conducts shop inspections for occupational health hazards and measures for their control. He cannot expect to evaluate working conditions and thereby detect occupational health hazards early unless he makes periodic inspections through the plant. In this way he can observe the adequacy of existing measures against specific hazards and decide whether such methods are being properly utilized. These inspections also have a psychologic value, in that they create greater respect for the medical service in the minds of the employees.

(*c*) Supervision of special physical examinations. This includes handling of preemployment cases when the applicant reports previous exposure to potential industrial health hazards, such as lead fumes or foundry dust; periodic examinations of groups exposed to such potential occupational hazards, e. g., spray painters and sandblasters; examination

ndustrial injuries and

(f) Industrial hygiene

icer

is specifically detailed
direction of the senior
activities.
ate practice of indus-
dependent on the close
engineer and that of
obtain a grasp of the
lize industrial hygiene



hygiene in navy yards.

r is responsible for the
entilation, illumination,
d condition of sanitary
or occupational health
nnot expect to evaluate
al health hazards early
plant. In this way he
against specific hazards
operly utilized. These
at they create greater
e employees.
ations. This includes
plicant reports previous
such as lead fumes or
xposed to such potential
ndblasters; examination



of persons referred for transfer to other shops where there is a question of occupational disability, and clinical studies for a decision as to industrial origin of obscure disabilities. (*d*) Medical surveys of occupational groups.—This will be discussed later. (*e*) Administration of the medical aspects of claims for compensation for occupational disease pending before the United States Employees' Compensation Commission. (*f*) Supervision of preparation of accident and occupational disease reports for the Navy Department.

THE SAFETY ENGINEER

A civilian safety engineer is stationed at the Navy Department as the adviser to the head of the Shore Establishments Division. A naval officer is assigned to each navy yard as the safety engineer.

*1. Accident and Unsafe Practice Control.*—Safety engineering is one of the divisions of the navy yard organizations. The safety engineer conducts an investigation of all lost time accidents with a view to fixing the cause and advising measures to prevent their recurrence. The basic features of approach to the safety problem in navy yards are provision of safety devices, such as mechanical guarding, and the safety education of workmen and their supervisors.

Another important aspect is the competitive approach, which has proved effective in stimulating interest in accident prevention. The Navy Department publishes the comparative safety scores of all navy yards monthly.

Figure 2 emphasizes the advance made by the Navy Department in accident reduction, beginning with an intensive safety campaign in navy yards in 1926. The period covered is from 1926 to 1937 inclusive. The accident rate was lowered from 20 to practically 10 per year in a twelve year period; the severity rate reduced from 2.2 per year to 0.5. On the other hand, it will be noted that the total man hours worked during the period increased to 115 million from 65 million per year, the average number of employees rising from approximately 30,000 to 66,000.

*2. Occupational Health Control.*—The control of occupational disease in navy yards naturally lies within the sphere of both the safety engineer and the industrial medical officer. Although the safety engineer is administratively charged with this task, the medical officer is actually coordinate with him in this phase.

As a matter of fact, the medical officer is the key man in the prevention of industrial disease in navy yards, in that he usually discovers its existence. The diagnosis having been made, the occupational history and the preemployment examination record are carefully reviewed in order to reach a decision, if possible, whether the hazard can be traced

Case 1:07-cv-00050-S-DLM Document 1-16 Filed 02/05/2007 Page 6 of 12





to present or past employment. If it is ascribed to or aggravated by environmental conditions, the medical officer confers with the safety engineer, and an industrial hygiene survey is usually recommended to the commandant.




Fig. 2.—Statistical data on accidents for the United States navy yards and naval stations.

THE INDUSTRIAL HYGIENE SURVEY

An industrial hygiene survey is of course a combined medical and engineering task.

*1. The Medical Survey.*—This consists of a complete clinical study, with detailed occupational histories of all exposed personnel as a case-finding procedure under the supervision of the industrial medical officer.

ɔed to or aggravated by
confers with the safety
isually recommended to



States navy yards and naval

urvey

i combined medical and

complete clinical study,
ied personnel as a case-
industrial medical officer.



Although not directly responsible beyond the medical survey, it is important that the medical officer have a reasonable grasp of the entire problem so that he will be in a position to utilize all data that have any bearing on the interpretation of his medical findings. In addition, he may act in an adivsory capacity to the safety engineer with respect to certain technical phases in the planning and conduct of the engineering aspects of the survey.

2. *The Engineering Survey.*—The engineering phases of an industrial hygiene survey in a navy yard fall, naturally, under the direction of the safety engineer. As in a commercial industry, this embraces essentially a complete story of the occupational duties, the physical conditions of work, and the materials, processes and equipment of the individual shop; in other words, the environmental conditions.

Laboratory facilities: No facilities are provided for technical studies in the navy yard organization, and there is no central laboratory unit in Washington which could supply industrial hygienists for field studies. This is an urgent need, and recommendations have recently been made to the end of setting up such an agency.

The Navy Department has been most fortunate in the past in securing the services of the Division of Industrial Hygiene of the United States Public Health Service to conduct such technical studies, much in the same way that industries in the states utilize the facilities of state bureaus of industrial hygiene.

The safety engineer formulates the control program of the health hazard on the basis of the data obtained in the survey. After all, once the cause is disclosed, prevention of occupational disease is largely an engineering problem.

THE REPORTING OF INDUSTRIAL ACCIDENTS AND ILLNESS

An important advance in accident prevention by the Navy was initiated on July 1, 1940, when the Secretary directed that a report of each accident and illness, both "lost time" and "no lost time," occurring among civil personnel of navy shore establishments be made to the Bureau of Medicine and Surgery. The report of each accident is submitted on a form, known as form F-C (fig. 3). This presents the diagnosis of the injury and the essential details as to the cause. Punch cards are made up from these records for mechanical tabulating and indexing through a sorting machine. This provides facilities for the statistical analysis of these accidents and diseases, and the data obtained promise to be a far reaching contribution to the subject of accident control. Prior to use of this system a crude system of accident reporting to the department was in effect, but it was not adapted to statistical analysis.




Fig. 3.—Form for report of industrial disability.

OCCUPATIONAL HEALTH HAZARDS IN NAVY YARDS

The chief potential occupational health hazards in navy yards will now be considered as indicated in the accompanying table. The data are based chiefly on reports to the United States Employees' Compensation Commission over a series of years. It hardly requires emphasis that industrial medical officers must be constantly on the alert for new health hazards.

*Occupational Health Hazards in United States Navy Yards*

1. Dust Diseases
   (a) Silicosis: foundry workers and sandblasters.
   (b) Asbestosis: makers of pipe insulating covers
2. Diseases Due to Lead and Lead Compounds
   (a) Spray lead painters
   (b) Brush lead painters
   (c) Lead putty workers
   (d) Oxyacetylene welders: cutting and scrapping of ships
   (e) Handlers of molten lead: preparation of Babbitt metal and lead coating of metals
   (f) Handlers of lead azide: used in pulverized form as a detonator in naval munitions
3. Diseases Due to Volatile Organic Solvents
   (a) Lacquer spray painting
   (b) Degreasing of machinery: benzene, toluene, xylene, trichlorethylene, higher alcohols, etc.
4. Diseases Due to Roentgen Rays and Radium
5. Diseases Due to Welding
   (a) Nitrous gases
   (b) Metallic oxides, of potentially toxic nature; manganese, lead, fluorides, silicon, zinc, etc.
   (c) Zinc fume fever
   (d) Eye hazards: actinic ophthalmia chiefly
6. Chromate Poisoning: electric platers
7. Diseases Due to Ingestion of Radium: painters of luminous dials of instruments
8. Injuries from Nitro Explosives: workers in high explosives, such as T. N. T. and tetryl (tetranitromethylaniline)
9. Diseases Due to Metallic Dust
   (a) Excessive pulmonary fibrosis: grinders, buffers and polishers: carborundum, alundum, etc.
10. Dermatoses: Machine operators from contact with cutting and soluble oils
11. Diseases Due to Excessive Heat: heat cramps, heat exhaustion and heat stroke
12. Caisson Disease: diving operations
13. Functional Disturbances
    (a) Anoxemia: from entering confined spaces
    (b) Phosgene poisoning: from carbon tetrachloride used to extinguish fires in confined spaces
    (c) Carbon monoxide poisoning: incident to oil fires in confined spaces

*1. Dust Diseases.*—(*a*) Silicosis: Important units of all navy yards are iron, steel and brass foundries. The dust control problem is a major concern in these plants as in civil industry.

One of the difficulties met with in combating the foundry dust problem in navy yards is the fact that silica (silicon dioxide) dust is not particularly irritating or obnoxious in concentrations which may ultimately lead to pulmonary damage. As a result there is a tendency to an indifference on the part of the workers and even of the supervisors and executives which must be overcome in order to accomplish effective and permanent dust control. Another reason for this attitude is the long period necessary for silicosis to develop in foundry workers exposed to only moderate concentrations of dust, such as molders.

SURGERY

disability.

A medical survey of the foundries of the Navy Yard, Washington, D. C., was conducted by me in 1939. Of 525 men subjected to roentgen examination, approximately 60 per cent had a record of ten years or over and 36 per cent a record of twenty years or over of total foundry employment. Silicosis was found in 12, or 2.4 per cent of the total—in all of them in stage 1 or 2; these data led to recommendations for improved methods of dust control.

Industrial hygiene surveys in foundries other than the Washington Navy Yard have not as yet been carried out but would in all probability disclose a certain incidence of silicosis, even if not of the disabling type. The medical control of silicosis in the naval establishment consists of roentgen examination of the chest before employment and an annual roentgenogram of every man exposed to the higher silica dust concentrations, such as sandblasters and shake-out men.

(*b*) Asbestosis: This is a potential occupation disease hazard due to inhalation of asbestos dust among workers engaged in the manufacture of asbestos insulating covers for flanges, valves and high temperature steam turbines.

I recently conducted a medical survey of the workers of the pipe-insulating shop of the New York Navy Yard, inclusive of roentgen studies. The maximum working period of exposure was seventeen years. No cases of asbestosis were found. Similar findings have been reported from two other yards, but the study should be extended to all men in this trade.

Medical control consists of taking a roentgenogram of the lungs annually. The material is moistened, and localized exhaust ventilation is installed over the work area. A respirator is worn during the dustiest aspect of the process.

2. *Diseases Due to Lead and Lead Compounds.*—Lead poisoning has become comparatively infrequent in recent years both among industrial and among service naval personnel. This is apparently due partly to changes in materials and methods and partly to improved measures of control. Zinc and titanium paints have largely replaced leaded material for ship interiors. Red lead paint is still in use as the priming coat on hull exteriors, but the finishing coats contain either no lead or a greatly reduced proportion. All painters regularly handling lead-containing paint are examined semiannually for evidences of lead absorption.

3. *Diseases Due to Volatile Organic Solvents.*—Lacquer spray painting is done on an extensive scale in navy yards and therefore demands rigid medical supervision. Another important application is in degreasing measures. All spray lacquer personnel are subject to semiannual physical examination.

4. *Diseases Due to Roentgen and Radium Hazards.*—Radium and roentgen rays are continually utilized for the detection of flaws in castings

Navy Yard, Washington.
men subjected to roentgen
record of ten years or over
er of total foundry employ-
r cent of the total—in all
mmendations for improved

ther than the Washington
ut would in all probability
not of the disabling type.
establishment consists of
nployment and an annual
higher silica dust concen-
:n.

tion disease hazard due to
gaged in the manufacture
es and high temperature

the workers of the pipe-
rd, inclusive of roentgen
was seventeen years.
have been reported
extended to all men in

tgenogram of the lungs
zed exhaust ventilation is
worn during the dustiest

nds.—Lead poisoning has
rs both among industrial
apparently due partly to
to improved measures of
replaced leaded material
e as the priming coat on
ther no lead or a greatly
handling lead-containing
of lead absorption.

s.—Lacquer spray paint-
s and therefore demands
application is in degreas-
e subject to semiannual

Hazards.—Radium and
ction of flaws in castings



and pipe-welded joints for high pressure steam installations. Radium has an advantage in the small size of the equipment in that it is adapted to tests in the confined machinery spaces of ships.

The question of protection from irradiation of the operating and other personnel working in the vicinity of the apparatus has received thorough study, the practice of the Bureau of Standards being generally followed. Complete blood counts of all technicians are conducted quarterly, and special preemployment examinations are prescribed.

Another potential hazard of radium is that of ingestion incident to radium painting of luminous dials, especially for fire control instruments and aircraft. The control measures advised by the Public Health Service are generally in force plus certain local regulations.

*5. Diseases Due to Welding.*—The hygienic supervision of welders is another outstanding feature of medical responsibility. Approximately 2,500 welders were on the rolls of the combined shore establishments as of Jan. 1, 1940, including 653 at New York. This number has progressively increased and will continue to rise.

The immense volume of work in confined spaces is characteristic of naval welding. A battleship of 35,000 tons displacement under construction contains approximately 500 compartments in which electric welding is mandatory; certain of these spaces are extremely small and force the welder to work in very cramped positions. These conditions complicate the question of effective preventive control of the hazards.

The chief hazards which have to be considered at present are "nitrous fume" poisoning, zinc fume fever, as it is popularly termed, and actinic opthalmia from ultraviolet irradiation of the welding arc. "Nitrous fume" poisoning, while comparatively rare, is a serious condition. No emphasis need be placed on the fact that these injuries would be still further reduced in number if the control measures provided were properly utilized.

It may be of interest to note that in 392 cases of actinic ophthalmia reported at the New York yard in the first ten months of 1940, only 30 per cent of the patients were welders, apprentice welders, helper welders and tack welders; the remaining 70 per cent were men exposed in spaces adjacent to the welding arc or assisting in welding operations but not utilizing available protective goggles.

Chronic poisoning among naval welders from manganese, fluorides or silicon, which might be ascribed to inhalation of these metallic or mineral oxides in the welding fumes originating in the rod coatings, has not been reported. The possibility of such poisoning, of course, cannot be denied.

Limitation of space prevents mention of additional occupational health hazards.

ANNUAL EXAMINATIONS OF CRANE OPERATORS, ENGINE MEN (HOISTING AND PORTABLE) AND LOCOMOTIVE ENGINEERS

These classes of workers are physically examined annually, with special emphasis on blood pressure, hearing and vision. In view of the nature of their duties, physical failure, such as sudden collapse, might involve critical injury to themselves and others and, in addition, damage to material. If corrective measures are impracticable the worker is retired or transferred to some suitable type of employment. A crane operator, for instance, presenting marked hypertension would be referred to his private physician and transferred to other duties.

LOSS OF TIME FROM INDUSTRIAL VERSUS NONINDUSTRIAL DISABILITIES

In a limited study of 116 industrial companies in various parts of the United States conducted by the American College of Surgeons a few years ago, it was found that the loss of time from nonindustrial types of illness was approximately fifteen times that industrially connected. In my capacity as senior medical officer of the Washington Navy Yard I made the following observations for the calendar year 1938: total industrial force, 7,000; average number of days lost from industrial accidents 0.14, and average number of days lost from nonindustrial illness or accident, 5.20. The time lost from nonindustrial disability was therefore thirty-seven times that lost from industrial causes. A similar study made by me at the New York Navy Yard for 1939 revealed that the time lost from industrial causes was roughly four times that from nonindustrial causes. The possible factors in the difference between the two yards have not been analyzed.

Disparities of the same general order have been reported in recent statistical studies by certain large commercial industries and reflect an enormous economic loss. Much of this nonindustrial illness is preventable. It is believed that in the naval establishments this wastage due to preventable illness can be greatly reduced if the problem is attacked by an annual physical examination of all employees, men requiring corrective treatment being referred to their private physicians or to other agencies. This would require a heavy increase in medical staffs, but it would be a profitable investment by naval industry in the saving of man power for national defense. It is a question worthy of being explored.