39. Defendants, individually and as agents of one another and as co-conspirators, aided, abetted, encouraged, counseled, assisted, agreed, and conspired among themselves and with other asbestos manufacturers and distributors to injure Plaintiffs.

40. The Defendants knew that the others' conduct constituted a breach of duty and gave substantial assistance or encouragement to the other so to conduct itself.

41. The Defendants acted in the following fashion:

(a) Defendant Metropolitan Life insurance Company (hereinafter "Met Life") required a tangible quid pro quo from McGill University in the 1920's in exchange for providing funding for a study of asbestos disease in Canadian miners. The study revealed asbestos miners suffered from asbestosis. The study was never published and agents of Met Life materially misrepresented in the published literature this known fact.

(b) In 1932, Met Life, through its agents Dr. Anthony Lanza, Dr. Fellows, and others, assisted co-conspirator Johns-Manville Corporation with medical examinations of over 1,000 employees of Johns-Manville's factory in Manville, New Jersey. The report of his study showed that a large percentage of the employees suffered from asbestosis including employees not directly involved in the manufacturing process. This 1932 medical survey was not published in the medical literature and therefore was unavailable to scientists studying the issues of asbestos disease. Further collaboration between the conspiring asbestos producers and Met Life officials continued this trend of intentional cover-up.

rue Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(c) Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and Attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Medical Director of Met Life (insurer of conspirators Johns-Manville, Raybestos, and others) that Dr. Lanza publish a study on asbestosis in which Dr. Lanza would affirmatively misrepresent a material fact about asbestos exposure; i.e., the seriousness of the disease process, asbestosis. This was accomplished through intentional deletion of Dr. Lanza's description of asbestosis as "fatal" and through other selective editing at the behest of the Defendants and their co-conspirators that affirmatively misrepresented asbestos as a disease process as being less serious than it actually is and was known to be then. As a result, Dr. Lanza's study was published in the medical literature in this misleading fashion in 1935. Defendant Met Life was motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent non-disclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits and workers' compensation claims involving Manville, Raybestos, Met Life, and others.

(d) In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to defendant Turner & Newall), Raybestos-Manhattan, Russell Manufacturing, Union Asbestos & Rubber Company, and defendant United States Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this

True Copy Attest

Office of Clerk of Superior Court
Counties ... & Bristol

agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and control what form such publications were to occur. This agreement gave these conspirators power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data resulting in numerous misstatements of fact being made at scientific meetings.

(e) On November 11, 1948, representatives of the following conspirators met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to defendant Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber Company, and defendant U.S. Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

(f) At this November 11, 1948 meeting, these defendants, co-conspirators and their respective representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of

A True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
State of Rhode Island

asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos-containing products.

(g) At this meeting, the defendants and their co-conspirators intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published in the medical literature as edited by Dr. Arthur Vorwald. The acts of these conspirators were carried out by co-conspirator defendant Met Life's agent, Dr. Lanza. The defendants and co-conspirators thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Plaintiffs.

(h) As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in January, 1951, in the Archives of Industrial Hygiene and Occupational Medicine (Vol. 3, No. 1), a journal of the American Medical Association. The published version stressed those portions of Gardner's work that the conspirators wished stressed, but omitted references to cancer, to human asbestosis, and to the inadequacy of the then-established threshold limit values hereinafter "TLVs". Furthermore, that article made a false claim that the published report was the "complete survey" of Dr. Gardner's work. The defendants thereby fraudulently, affirmatively, and deliberately disseminated this misleading publication to university libraries, government officials, medical doctors, agencies, the public, and others.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(i) Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

(j) The following conspirators and others were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.) : Johns-Manville Corporation, Carey-Canada (individually and as successor to Quebec Asbestos Corporation), the Celotex Corporation (successor to Quebec Asbestos Corporation), defendant National Gypsum Company (a/k/a Asbestos Claims Management Corporation), and defendant Turner & Newall (individually and successor to Bell asbestos). The members of Q.A.M.A. participated in the above-described misrepresentation of the work of Dr. Gardner published by Dr. Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership in the Q.A.M.A., as well as correspondence from co-conspirators indicating close monitoring of the editing process by Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A.'s members.

(k) Defendants who were members of the Q.A.M.A., began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies

True Copy Attest

Office of Cl... ...erior Court
Counties ... & Bristol

responsible for regulatory controls of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

(l) This plan of misrepresentation and influence over the medical literature began in or about 1950 when Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, the Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

(m) As a result of the termination of this study, these defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents Kenneth W. Smith, M.D., Paul Cartier, M.D., Arthur J. Vorwald, M.D., Anthony J. Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to, inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations, and the general public, including Plaintiffs.

(n) Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation (I.H.F.) and Dr. Daniel Braun to further study the relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and

True Copy Attest
Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

Truan reported to the Q.A.M.A. that asbestosis did increase a worker's chances of incurring lung cancer.

(o) The Q.A.M.A. defendants thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure did not increase the incidence of lung cancer, a conclusion known by the defendant conspirators to be patently false.

(p) By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that asbestosis did increase the risk of lung cancer, the Q.A.M.A. defendants affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

(q) In approximately 1958, the Q.A.M.A. defendants publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

(r) The fraudulent misrepresentations beginning in 1946, as elaborated above and continuing with the publication of the 1958 Braun/Truan study, influenced the standards set for the TLVs, and inhibited the lowering of the threshold limit value due to the cancer risk associated with asbestos inhalation.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(s) In 1967, Q.A.M.A. defendants determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

(t) In 1952, a symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, defendant Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin, and LeChance.

(u) At this meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all asbestos fiber types was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risk from the public, these defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals that thereby fraudulently misrepresenting existing data, albeit secret, that could not be publicized because of the secrecy provisions contained in the 1936 Saranac Agreement required by the asbestos industry members.

(v) The following conspirators were members of the Magnesia Insulation Manufacturers Association (MIMA): Phillip-Carey Corporation (predecessors to Celotex), Johns-Manville, and others.

True Copy Attest

[signature]

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

(w) In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who used these products.

(x) The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison (individually and through its alter-ego defendant Turner & Newall), defendant National Gypsum (n/k/a Asbestos Claims Management Corporation), and others.

(y) In 1947, the members of the ATI received a report from W.C.L. Hemeon regarding asbestosis that suggested re-evaluation of the then-existing TLVs for asbestos exposure. These defendants caused this report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresented to the public and class of persons exposed to asbestos that the then-existing TLV was acceptable. Thereafter, these defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of TLVs for asbestos exposure.

(z) In 1953, defendant and conspirator National Gypsum (n/k/a Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products,

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

(aa) In 1955, conspirator Johns-Manville through its agent Kenneth W. Smith, M.D., caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

(bb) In 1955, the National Cancer Institute held a meeting at which conspirators Johns-Manville (individually and as an agent for other alleged co-conspirators) and Dr. Vorwald (as agent of co-conspirators) affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies that demonstrated that positive evidence did exist.

(cc) In 1957, the members of the ATI jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulent concealment from the public of material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
... Island

(dd) In 1964, the members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

(ee) In 1970, through their agents, co-conspirators Celotex Corporation and Carey-Canada affirmatively misrepresented that they had been in the asbestos business since 1918 and found no reported conditions of asbestosis or lung disease. This constituted a fraudulent misrepresentation about the material facts known to these conspirators.

(ff) All conspirators approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos Manhattan, and Anthony J. Lanza, M.D., acting on behalf of defendant Met Life, and all alleged co-conspirators during the relevant time period and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

42. All of the aforementioned defendants:

(a) did a tortious act in concert with the other or pursuant to a common design with them; and/or

(b) knew that each other's conduct constituted a breach of duty and they each gave a substantial assistance or encouragement to the other so to conduct himself; and/or

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol

(c) gave substantial assistance to the other in accomplishing a tortious result and its own conduct, separately considered, constitutes a breach of duty to the plaintiffs.

43. The acts of the defendants as described above constitute a fraudulent concealment and/or a fraudulent misrepresentation that proximately caused injury to the Plaintiffs in the following manner:

(a) The material published or caused to be published by the defendants was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-containing products.

(b) Defendants individually, as members of a conspiracy, as agents of other co-conspirators, and as aiders and abettors of each other intended that the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

I. maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

ii. assist in the continued pecuniary gain of the defendants through the sale of their products;

iii. influence in the defendants' favor proposed legislation to regulate asbestos exposure and;

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

iv. to provide a defense in lawsuits and workers compensation claims brought for injury resulting from asbestos disease.

(c) Plaintiff reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-containing products and the absence of published medical and scientific reports on the extent, nature, and existence of hazards of asbestos and asbestos-containing products to continue exposure to it because of a belief that it was safe.

(d) Defendants individually, as members of a conspiracy, and as agents of each other intended that Plaintiff rely upon the published report regarding the safety of asbestos and asbestos-containing products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products, to continue his exposure to these products.

(e) Defendants individually, as members of a conspiracy, as agents of each other, and as aiders and abettors of each other are and were in a position of superior knowledge regarding the health hazards of asbestos and therefore Plaintiff had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-containing products.

(f) Plaintiff suffered (and will continue to suffer) injury as a direct result and proximate result of the acts alleged herein. As a direct and proximate result of the acts of

True Copy Attest:

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

the Defendants, Plaintiff suffered serious bodily injury, endured (and will continue to endure) great pain and suffering, incurred (and will continue to incur) medical expenses, suffered (and will continue to suffer) mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

44. Plaintiff suffered injury as a direct result and proximate result of the acts alleged herein. As a direct and proximate result of the acts of the Defendants, Plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

## COUNT VII

The plaintiffs hereby re-allege and incorporate by reference Paragraphs 1 through 44.

45. As a result of the plaintiff, ROBERT W. CAMPBELL'S exposure to and coming in contact with asbestos and asbestos-containing products, and his inhaling and ingesting fibers from said asbestos and asbestos-containing products that were manufactured, produced, sold and/or supplied by the defendants, the plaintiff died on December 28, 2003.

46. The plaintiff's spouse is the widow of the plaintiff and brings this cause of action for the benefit of herself, individually, and as beneficiary and as representative of all the beneficiaries of the plaintiff's decedent pursuant to R.I.G.L. section 10-7-1 TO 10-7-10.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island

47. Plaintiff suffered injury as a direct result and proximate result of the acts alleged herein. As a direct and proximate result of the acts of the defendants, plaintiff suffered serious bodily injury, endured great pain and suffering, incurred medical expenses, suffered mental anguish, lost earnings and earning capacity, requires medical monitoring, and was otherwise damaged.

48. The plaintiffs demand trial by jury.

WHEREFORE Plaintiffs ROBERT W. CAMPBELL (deceased), DIANE L. CAMPBELL, DANIEL RAY PATTERSON, BRIAN LEE PATTERSON, TINA VALDEZ, TAMMY MCILLRATH, ROBERT CAMPBELL JR., and KEVIN CAMPBELL, natural children of the deceased, pursuant to R.I.G.L Section 10-7-3, prays that after due proceedings herein that there be judgment in their favor and against the Named Defendants, jointly and severally, for damages, plus whatever other further relief this Honorable Court deems right and just, including but not limited to compensatory damages as are reasonable, punitive damages, and exemplary damages, attorneys' fees, interest and costs, together with all other general and equitable relief.

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, [illegible]

New Haven, Connecticut, this 17th day of December 2006.

RESPECTFULLY SUBMITTED:

THE PLAINTIFFS,

EARLY LUDWICK & SWEENEY, LLC
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT 06508-1866
Telephone (203) 777-7799
Telecopier (203) 785-1671

**Please respond to Connecticut office**

One Richmond Square
Providence, RI 02906
Telephone (401) 331-3661

By: ______________________
Robert J. Sweeney, Esq.
R.I. Bar Roll No. 5865
Brian P. Kenney, Esq.
R.I. Bar Roll No. 7217
Richard P. Bullock, Esq.
Louisiana Bar Roll No. 20733
(Pursuant to Pro Hac Motion)
Donni E. Young, Esq.
Louisiana Bar Roll No. 19843
(Pursuant to Pro Hac Motion)

True Copy Attest

Office of Clerk of Superior Court
Counties of Providence & Bristol
Providence, Rhode Island